IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT HARKONEN,<br><br>    Plaintiff,<br><br>  v.<br><br>THOMAS FLEMING,<br><br>    Defendant.<br>_____ / | No. C 12-1267 SI<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16 (ANTI-SLAPP)** |

On June 22, 2012, the Court held a hearing on defendant's motion to strike the complaint. For the reasons set forth below, the Court GRANTS defendant's motion to strike the complaint.

**BACKGROUND**

Plaintiff Dr. Scott Harkonen is a medical doctor and former CEO of InterMune, Inc., a publicly traded biotechnology company. Harkonen Decl. ¶¶ 1-3. While plaintiff was CEO, InterMune conducted a clinical trial ("GIPF-001") of the prescription drug Actimmune® (interferon gamma-1b) for the treatment of idiopathic pulmonary fibrosis ("IPF"), a fatal lung disease for which there is no FDA-approved treatment. Compl. ¶ 2; Sutro Decl. Ex. D at 12.[1] Defendant Dr. Thomas Fleming, a professor

---

[1] Actimmune® was approved by the FDA for the treatment of chronic granulomatous disease and severe, malignant osteopetrosis. Sutro Decl. Ex. D at 12. Plaintiff objects to Exhibit D, and all other evidence from plaintiff's criminal trial, on relevance grounds. The Court cites this portion of Exhibit D solely to support the undisputed factual statement regarding the nature of idiopathic pulmonary fibrosis, as well as the basis for FDA's approval of Actimmune®. The Court rules on plaintiff's evidentiary objections only to the extent that this order relies on the evidence at issue.

and former chair of the Department of Biostatistics at the University of Washington, acted as the biostatistician on the Actimmune® trial's Data Monitoring Committee ("DMC"), which was charged with monitoring data concerning patient safety and treatment efficacy. Fleming Decl. ¶¶ 1-2. Defendant is a publishing academic and is also active on the lecture circuit. This lawsuit arises out of allegedly defamatory statements made by defendant regarding a press release issued by plaintiff about the Actimmune® clinical trial, and the interpretation of data from that trial.

The complaint alleges that the cutoff date for the clinical trial was June 26, 2002. *Id.* ¶ 9. On August 28, 2002, InterMune issued a press release regarding the clinical trial. *Id.* ¶ 10; Harkonen Decl. Ex. B. The press release claimed that the drug demonstrated a survival benefit for treatment of idiopathic pulmonary fibrosis. Harkonen Decl. Ex. B. Its headline read: "InterMune Announces Phase III Data Demonstrating Survival Benefit of Actimmune in IPF," and was subtitled: "Reduces Mortality by 70% in Patients with Mild To Moderate Disease." *Id.* The press release stated that data from the trial demonstrated a "significant survival benefit [for a subgroup of patients] . . . versus control treatment." *Id.*

It is undisputed that the survival benefit reported in the press release was based upon a post-hoc analysis, that is, an analysis of data which had not been pre-specified in the clinical trial protocol, in that the written protocol for the clinical trial had not called for an analysis of the subgroup of patients with mild to moderate disease. Further, the press release was based on an analysis of the clinical trial data through June 26, 2002, and did not include clinical trial data after that date, including two deaths that occurred after June 26, 2002, but before the August 28, 2002 press release.[2]

On September 5, 2002, defendant sent InterMune a letter regarding his "serious concerns" about "misrepresentations" in the press release. Fleming Decl., Ex. E at 1, 4. The letter stated that at an August 19, 2002, meeting of the DMC during which the DMC reviewed the clinical trial data, the DMC

---

[2] Plaintiff was criminally prosecuted and convicted for making knowing false and fraudulent statements in the press release. Specifically, a criminal jury found that "the press release's characterization of the [trial's] results were illegitimate and objectively false," leading to plaintiff's conviction of one count of wire fraud in violation of Title 18, U.S.C. § 1343. *United States v. Harkonen*, No. C 08-00164 MHP, 2010 WL 2985257, at *20 (N.D. Cal. July 27, 2010). Plaintiff's appeal of that conviction is currently pending in the Ninth Circuit Court of Appeals.

2

concluded that Actimmune® did not provide statistically significant evidence of benefit for the primary endpoint (objective) of the clinical trial. *Id*. The letter also stated,

> The most comprehensive survival data, as presented to the DMC on August 19, indicated only a modest suggestion of survival benefit, (18 versus 28 deaths []). Given that these survival data were only interim in nature, and that survival was only a secondary endpoint, with the protocol specifying that six other secondary endpoints were considered to be of greater "clinical relevance to IPF", such evidence must be interpreted with much greater caution than as presented in the News Release. (Note that the survival data on June 26, 2002, cannot be interpreted as the "primary analysis" of the secondary survival endpoint. Per an agreement with FDA and with the DMC at its April 24, 2002 meeting, data on secondary endpoints, including survival, would be of an interim nature until completion of follow-up at the time of patients' study completion visits. Once the sponsor knew about any survival outcomes that occurred after June 26—specifically that there were two additional deaths on Actimmune and none on control—these additional outcomes cannot be excluded without bias.)

*Id*. at 3.

The two other members of the DMC both expressed full agreement with defendant's letter. Riley Decl. ¶ 8 & Ex. D; Reis Decl. ¶ 11 & Ex. D. In a letter dated September 27, 2002, InterMune replied to Dr. Fleming. InterMune reiterated that the clinical trial's cutoff date was June 26, 2002, and stated that "[a]lthough we appreciate this point, it is our intention to discourage week-by-week analysis . . . Our next analysis of survival status will . . . be accomplished by a complete canvas of the vital status for all patients, including those who have discontinued formal study follow-up." Fleming Decl., Ex. I at 4.

After plaintiff's criminal conviction, defendant wrote an article for the peer-reviewed *Annals of Internal Medicine*. Fleming Decl. ¶ 30 & Ex. M. When writing the article, Dr. Fleming solicited input from two doctors still employed at InterMune, Bill Bradford and Steven Porter. *Id*. ¶ 35. Both doctors provided permission to be acknowledged for their role in reviewing the paper, and neither recommended any changes to the allegedly defamatory statements in the article. *Id*. After publication of the article, plaintiff contacted the editor of the journal requesting certain corrections. Fleming Decl. ¶ 37 & Ex. O. Defendant wrote the journal a response to plaintiff's request and asked Dr. Bradford of InterMune to review a draft of the response before sending it. Fleming Decl. ¶ 39.[3] Dr. Bradford reviewed the letter and commented that he was "happy to support [Dr. Fleming's] efforts to provide an accurate response

---

[3] Plaintiff objects to this paragraph of Dr. Fleming's declaration as irrelevant. The Court OVERRULES this objection.

3

1 to the [plaintiff's] accusations, and [felt] a moral obligation to do so given the history and clear
2 distortion of fact in [plaintiff's] letter to the Editor at the Annals." Fleming Decl., Ex. Q.[4] The editor
3 of the journal made a correction regarding the cutoff date (changing it from June 15 to June 26, 2002),
4 but the editor made no changes regarding the allegedly defamatory statements. *Id*., Ex. T.[5]

Plaintiff alleges that he was defamed by defendant's article in *Annals of Internal Medicine*, public lectures at universities, and defendant's publication of those lectures on the internet, all of which concern the press release. Plaintiff alleges that in the *Annals* article and the lectures, Fleming made defamatory statements that Harkonen falsified the test data by improperly concealing the deaths of two people. Compl. ¶¶ 16-17. The complaint provides the following examples of allegedly defamatory statements:

- "The 10 secondary endpoints were all negative. OK survival had a bit of positive trend, P of Point 08, however, survival was an endpoint specifically targeted for follow-up until the clinical closeout visits in November. So the survival data are actually still not final. And in fact between the clinical cut date in October and the date in our [DMC] meeting there were two additional deaths in the acting Actimmune arm so that the updated data were even a little bit less favorable.";

- "Well they went to the 7th secondary endpoint, survival, they went to an interim value, I am going to go back 2 slides, the actual current data were 18 deaths against 28, they ignored those 2 deaths, went back to the 16 against 28 and that still wasn't enough to go to survival and to an interim analysis there was another level of subgrouping, which was the subgroups, they went to those with mild to moderate disease and in mild to moderate disease, there were 6 deaths against 20 in that subgroup. So they threw away the excess deaths that were in the wrong direction in the other group, in the mild to moderate disease group, there is a 70 percent reduction rate, the P value was 004.";

- "The final analysis of survival data was to include events occurring through the time of the close-out visits because of an anticipated small number of deaths . . . The analysis

---

[4] Plaintiff objects to Exhibit Q as irrelevant. The Court OVERRULES this objection.

[5] Plaintiff objects to Exhibit T as irrelevant. The Court OVERRULES this objection.

4

ignored 2 additional deaths of participants who took Actimmune, which occurred after the 15 June 2002"; "Twelve deaths from the Actimmune subgroup (10 in patients with advanced disease and 2 occurring from 15 June 2002 to 19 August 2002) and 7 deaths from the placebo group (all in patients with advanced disease) were excluded."; "With the inclusion of 2 additional deaths that occurred between the pre-specified cutoff for the primary analysis of the primary end point (15 June 2002) and the release of data to the sponsor (19 August 2002), 18 patients who died had been taking Actimmune and 28 had been taking placebo, with a corresponding nominal 2-sided P value of 0.15."

Compl. ¶¶ 16-17. Plaintiff alleges that these "unpriviledged oral and written statements about [plaintiff]" have caused "actual injury to [plaintiff's] personal and professional reputation. Specifically, [defendant] has repeatedly accused [plaintiff] of falsifying the GIPF-001 test data by intentionally concealing the deaths of two clinical trial participants." *Id*. ¶ 3. Plaintiff alleges that these "false statements . . . were made of and concerning [plaintiff] and were understood by those who heard them to be [about plaintiff]." *Id*. ¶ 26. Additionally, plaintiff alleges that defendant "knew that these statements were false or acted in reckless disregard to the truth of [the] statements." *Id*. ¶ 27.

## LEGAL STANDARD

The California anti-SLAPP statute permits defendants to bring a "special motion to strike" if a cause of action against them arises "from any act . . . in furtherance of the . . . right of petition or free speech . . . in connection with a public issue," unless "the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Code Civ. Proc. § 425.16(b)(1). "In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." *Id*. at § 425.16(b)(2). If a defendant prevails on a motion to strike, that defendant "shall be entitled to recover his or her attorney's fees and costs." *Id*. § 425.16(c). Although it is a state statute, California's anti-SLAPP protections apply to state law claims brought in federal court. *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 971-73 (9th Cir. 1999).

5

In evaluating an anti-SLAPP motion, courts engage in a two-part inquiry. "First, a defendant must make an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech . . . Second, once the defendant has made a prima facie showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged claims." *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1110 (9th Cir. 2003). The plaintiff's burden is "comparable to that used on a motion for judgment as a matter of law." *Price v. Stossel*, 620 F.3d 992, 1000 (9th Cir. 2010). "The plaintiff must demonstrate that the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. A defendant's anti-SLAPP motion should be granted when a plaintiff presents an insufficient legal basis for the claims or when no evidence of sufficient substantiality exists to support a judgment for the plaintiff." *Id.* at 1000 (citations and internal quotation marks omitted). Evidence must be admissible and is not weighed by the Court, but presumed true if in favor of the plaintiff. *See, e.g.*, *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001); *Tichinin v. City of Morgan Hill*, 177 Cal. App. 4th 1049, 1062 (2009).

**DISCUSSION**

**I.     Act in furtherance of the defendant's rights of free speech**

The first step in analyzing an anti-SLAPP suit is determining whether the defendant successfully made "an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech." *Vess*, 317 F.3d at 1110. Defendant argues that "[p]laintiff's [c]omplaint indisputably arises from statements in a respected scientific journal and lectures over a matter that [p]laintiff acknowledges is in the public's interest." Mot. to Strike Compl. at 1. Plaintiff concedes for the purposes of this motion that "this threshold requirement is met," and that the burden shifts to the plaintiff to demonstrate a probability of success on the claim. Pl.'s Opp'n at 5.

**II.    Defamation**

For plaintiff's defamation claim to survive dismissal at this stage, plaintiff must demonstrate a probability that he will prevail on each element. Under California law, to state a *prima facie* case of

6

1 defamation, a plaintiff must show (1) "the intentional publication" of (2) "a statement of fact" that (3) is "false" (4) "unprivileged," and (5) "has a natural tendency to injure or which causes special damage." *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999). Additionally, if plaintiff is found to be a limited purpose public figure, plaintiff "must establish a probability that he or she can produce clear and convincing evidence that allegedly defamatory statements were made with knowledge of their falsity or with reckless disregard of their truth or falsity." *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 700 (2007) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). Further, the First Amendment requires that a defamation claim be based on a statement "of and concerning" the plaintiff. *Blatty v. New York Times,* 42 Cal. 3d 1033, 1042 (1986).

### A. Common interest privilege

Defamation requires that the allegedly false statement be unprivileged. The parties dispute whether defendant's statements fall under the common interest privilege defined by Cal. Civ. Code § 47(c)(1) ("A privileged publication or broadcast is one made in a communication, without malice, to a person interested therein . . . by one who is also interested.").

Here, defendant is a professor whose allegedly defamatory statements appeared in *Annals of Internal Medicine*, an academic medical journal published by the American College of Physicians (ACP). The statements were allegedly also made during speeches at universities such as the University of Washington, School of Public Health. Fleming Decl. ¶ 41.[6] Such scholarly activity is generally considered to fit within the common interest privilege. *See Taus v. Loftus*, 40 Cal. 4th 683, 721 (2007) ("[I]t is clear that the alleged defamatory statement here in question—a statement made by [defendant], a psychology professor and author, at a professional conference attended by other mental health professionals and that was related to the subject of the conference—falls within the reach of this statutory common-interest privilege."); *Lundquist v. Reusser*, 7 Cal. 4th 1193, 1204 (1994) (statements made at "a seminar to persons sharing a common interest in horse breeding, were made upon a 'privileged occasion' for purposes of the common-interest privilege"); *Institute of Athletic Motivation*

---

[6] Plaintiff objects to this paragraph of Dr. Fleming's declaration as irrelevant. The Court OVERRULES this objection.

7

*v. University of Illinois*, 114 Cal. App. 3d 1, 7-14 (1980) (common-interest privilege applied to letter, criticizing plaintiff's "sports-specific" psychological testing, that was sent by university physical education professor to athletic organizations and sports magazines); *Katz v. Rosen*, 48 Cal. App. 3d 1032 (1975) (common-interest privilege applied to letter sent by defendant to local bar association complaining of plaintiff attorney's conduct). Under this authority, the Court finds that defendant's lectures and journal article are privileged under Cal. Civ. Code § 47(c)(1).

"Under Civil Code section 47, subdivision (c), defendant generally bears the initial burden of establishing that the statement in question was made on a privileged occasion, and thereafter the burden shifts to plaintiff to establish that the statement was made with malice." *Taus*, 40 Cal. 4th at 721. "The malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff or by a showing that the defendant lacked reasonable ground for belief in the truth of the publication and thereafter acted in reckless disregard of the plaintiff's rights." *Sanborn v. Chronicle Pub. Co.*, 18 Cal. 3d 406, 413 (1976); *see also* Cal. Civ. Code § 48a(4)(d) ("'Actual malice' is that state of mind arising from hatred or ill will toward the plaintiff; provided, however, that such a state of mind occasioned by a good faith belief on the part of the defendant in the truth of the libelous publication or broadcast at the time it is published or broadcast shall not constitute actual malice."). When considering privileged speech, the plaintiff must establish a probability that he can show the defendant acted with malice by a preponderance of the evidence. *Manguso v. Oceanside Unified Sch. Dist.*, 153 Cal. App. 3d 574, 580-81 (1984). The presence *vel non* of actual malice in this case is discussed later in this order.

### B. Limited purpose public figure

The parties dispute whether plaintiff qualifies as a limited purpose public figure under First Amendment jurisprudence. "[W]hether a plaintiff in a defamation action is a public figure is a question of law for the trial court." *Khawar v. Globe Int'l, Inc.*, 19 Cal. 4th 254, 264 (1998). "The limited purpose public figure is an individual who voluntarily injects him or herself or is drawn into a specific public controversy, thereby becoming a public figure on a limited range of issues." *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1577 (2005). *Ampex* sets forth the three part test for determining

8

1 whether an individual is a limited purpose public figure: "First, there must be a public controversy, 2 which means the issue was debated publicly and had foreseeable and substantial ramifications for 3 nonparticipants. Second, the plaintiff must have undertaken some voluntary act through which he or 4 she sought to influence resolution of the public issue. In this regard it is sufficient that the plaintiff 5 attempts to thrust him or herself into the public eye. And finally, the alleged defamation must be 6 germane to the plaintiff's participation in the controversy." *Id.*

7 The Court finds that the first step of the *Ampex* test – public controversy – is met. "In general, 8 [a] public issue is implicated if the subject of the statement or activity underlying the claim (1) was a 9 person or entity in the public eye; (2) could affect large numbers of people beyond the direct 10 participants; or (3) involved a topic of widespread, public interest." *D.C. v. R.R.*, 182 Cal. App. 4th 11 1190, 1226 (2010) (internal citations omitted). Defendant's speech addressed the interpretation of 12 clinical trial results and the dangers of post-hoc analyses. The issue was debated publicly in academic 13 circles, and involved a topic of widespread interest. Plaintiff does not seriously dispute that the alleged 14 defamation involved a matter of public interest, and indeed the declarations from scientists and 15 academics and news articles submitted by plaintiff demonstrate that the issue of appropriate 16 interpretation of clinical trial data was, and remains, hotly debated. *See Taus*, 40 Cal. 4th at 712-13 17 (articles in scientific journal regarding suppressed memories of childhood abuse constituted speech in 18 connection with a public issue given "substantial controversy in the mental health field regarding 19 whether, and under what circumstances, a victim of child abuse might forget or suppress the memory 20 of the abuse over a long period of time and later recover that memory in response to questioning or other 21 actions by a therapist"); *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 25 (2007) (holding that "the relative 22 merits of plastic surgery" qualifies as a public controversy).

23 Second, plaintiff willingly inserted himself into the public's eye on this issue by issuing a press 24 release regarding the clinical trial data. *See Ampex*, 128 Cal. App. 4th at 1578 (corporation and its 25 chairman were limited purpose public figures based on issuance of press release and posting of letters 26 on company web site). Plaintiff cites inapposite authority stating that one's response to defamatory 27 speech cannot support finding voluntary participation in a public controversy. *See Hutchinson v.* 28 *Proxmire*, 443 U.S. 111 (1979); *see also Hailstone v. Martinez*, 169 Cal. App. 4th 728, 735 (2008) ("a

1 defendant charged with defamation cannot, through his or her own conduct, create a defense by making
2 the claimant a public figure."). Here, plaintiff's press release concerning the health effects of a drug
3 manufactured by a public company created an issue of public controversy before defendant's allegedly
4 defamatory statements, and the press release was an intentional act seeking public attention.

5 Third, the alleged defamation must be germane to the plaintiff's participation in the controversy.
6 This element of the test is met and not contested. The alleged defamation concerns the statements made
7 in the press release.

### C. Actual malice

10 Plaintiff bears the burden of demonstrating that defendant acted with actual malice, both because
11 the accused statements fall within the common interest privilege, Civil Code § 47(c), and because
12 plaintiff was a limited purpose public figure. Plaintiff's burden of proof on actual malice is by a
13 preponderance of the evidence, as to the common interest privilege. It is somewhat higher as to the
14 limited public figure claim: "[L]imited purpose public figures such as [plaintiff] who sue for defamation
15 must establish a probability that they can produce clear and convincing evidence that the allegedly
16 defamatory statements were made with knowledge of their falsity or with reckless disregard of their
17 truth or falsity." *Ampex*, 128 Cal. App. 4th at 1578. Malice "will not [be] infer[red] . . . solely from
18 evidence of ill will, personal spite or bad motive." *Id.* at 1579. Instead, "[a] court may consider a
19 defendant's anger or hostility toward a plaintiff in determining the presence of malice only to the extent
20 it impacts the defendant's *actual belief* concerning the truthfulness of the publication. The focus is thus
21 on the defendant's attitude toward the truth or falsity of the material published . . . [not] the defendant's
22 attitude toward the plaintiff." *Christian Research Inst. v. Alnor*, 148 Cal. App. 4th 71, 92 (2007)
23 (internal quotation marks omitted) (emphasis in original) (citing *Reader's Digest Assn. v. Superior*
24 *Court*, 37 Cal.3d 244, 258 (1984)).

25 Plaintiff asserts that defendant acted with actual malice because he knew that his statements were
26 false. Plaintiff argues that if "[e]ven a casual reader" can understand that the cutoff date was fixed, then
27 the Court should infer that defendant knew that his statements about ignoring "two additional deaths"
28 were factually inaccurate. Pl.'s Opp'n at 12. Plaintiff also asserts that the statements were motivated

10

by hatred or ill will toward the plaintiff. Harkonen Decl. ¶¶ 16-17 ("Dr. Fleming became very angry at InterMune, and, specifically at me."; "Dr. Fleming would never speak to me again after this insult [of excluding Dr. Fleming from a meeting]."; "he [Dr. Fleming] told me that he had nothing to say to me."; "He [Dr. Fleming] would not acknowledge my presence or make eye contact with me.").

The evidence before the Court demonstrates that plaintiff cannot prove, under either standard, that defendant acted with actual malice – that is, with knowledge of the statements' falsity or with reckless disregard of their truth or falsity. Before publishing his article in the *Annals of Internal Medicine*, defendant solicited the comment and input of employees at InterMune who had been involved in the Actimmune® study. Those scientists reviewed the article, affirmed its accuracy, and one specifically affirmed the statement: "the final analysis of survival data was to include events occurring through the time of the close-out visits because of an anticipated small number of deaths." Fleming Decl. ¶ 39 & Ex. Q. Additionally, the journal's editor received notice of plaintiff's concerns and elected to publish the article notwithstanding the complaint. The medical journal's support of the article is compelling evidence that defendant did not act in reckless disregard of the facts. This evidence, even when viewed in a light most favorable to plaintiff, defeats the malice requirement of knowingly publishing false information or publishing in reckless disregard for the truth. *See New York Times Co. v. Sullivan*, 376 U.S. at 287 (under the facts of the case, failure to thoroughly investigate when relying on the statements of those with good reputations "supports at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice"); *see also Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 84 (1967) (a *lack* of investigation may, but does not necessarily, imply reckless disregard).

### III.   Intentional infliction of emotional distress

Under California law, the elements of a *prima facie* case of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. *Hughes v. Pair*, 46 Cal.4th 1035, 1050 (2009). Additionally, "[t]o

11

impose liability on that theory [of intentional infliction of emotional distress] it must appear that the defendant's conduct was unprivileged." *Kachig v. Boothe*, 22 Cal. App. 3d 626, 641 (1971).

Given the academic nature of defendant's speeches and journal publication, the supporting testimony of InterMune employees, and the privileged nature of defendant's speech, plaintiff fails to demonstrate a probability of succeeding on this claim.

### IV. False light invasion of privacy

In California, "a 'false light' cause of action is in substance equivalent to a libel claim, and should meet the same requirements of the libel claim, including proof of malice." *Aisenson v. Am. Broad. Co.*, 220 Cal. App. 3d 146, 161 (1990). Further, "[w]hen a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action." *Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App. 4th 1359, 1385 n.13 (1999). Accordingly, plaintiff's false light invasion of privacy claim fails for the same reasons stated above.

### CONCLUSION

For the reasons set forth above, the Court GRANTS defendant's motion to strike the complaint. Docket No. 10.

**IT IS SO ORDERED.**

Dated: July 24, 2012

SUSAN ILLSTON
United States District Judge

12