**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   SCOTT HARKONEN,                              No. C 12-1267 SI

12          Plaintiff,                            **ORDER GRANTING DEFENDANT'S**
                                                  **MOTION TO STRIKE PURSUANT TO**
13   v.                                           **CALIFORNIA CODE OF CIVIL**
                                                  **PROCEDURE SECTION 425.16 (ANTI-**
14   THOMAS FLEMING,                              **SLAPP)**

15          Defendant.
                                        /
16

17          On June 22, 2012, the Court held a hearing on defendant's motion to strike the complaint.  For

18   the reasons set forth below, the Court GRANTS defendant's motion to strike the complaint.

19

20                                    **BACKGROUND**

21          Plaintiff Dr. Scott Harkonen is a medical doctor and former CEO of InterMune, Inc., a publicly

22   traded biotechnology company. Harkonen Decl. ¶¶ 1-3.  While plaintiff was CEO, InterMune conducted

23   a clinical trial ("GIPF-001") of the prescription drug Actimmune® (interferon gamma-1b) for the

24   treatment of idiopathic pulmonary fibrosis ("IPF"), a fatal lung disease for which there is no FDA-

25   approved treatment.  Compl. ¶ 2; Sutro Decl. Ex. D at 12.[1]  Defendant Dr. Thomas Fleming, a professor

26

27          [1] Actimmune® was approved by the FDA for the treatment of chronic granulomatous disease
     and severe, malignant osteopetrosis.  Sutro Decl. Ex. D at 12.  Plaintiff objects to Exhibit D, and all
28   other evidence from plaintiff's criminal trial, on relevance grounds.  The Court cites this portion of
     Exhibit D solely to support the undisputed factual statement regarding the nature of idiopathic
     pulmonary fibrosis, as well as the basis for FDA's approval of Actimmune®.  The Court rules on
     plaintiff's evidentiary objections only to the extent that this order relies on the evidence at issue.

**United States District Court**
For the Northern District of California

1   and former chair of the Department of Biostatistics at the University of Washington, acted as the

2   biostatistician on the Actimmune® trial's Data Monitoring Committee ("DMC"), which was charged

3   with monitoring data concerning patient safety and treatment efficacy. Fleming Decl. ¶¶ 1-2. Defendant

4   is a publishing academic and is also active on the lecture circuit.  This lawsuit arises out of allegedly

5   defamatory statements made by defendant regarding a press release issued by plaintiff about the

6   Actimmune® clinical trial, and the interpretation of data from that trial.

7        The complaint alleges that the cutoff date for the clinical trial was June 26, 2002.  *Id*. ¶ 9.  On

8   August 28, 2002, InterMune issued a press release regarding the clinical trial.  *Id*. ¶ 10; Harkonen Decl.

9   Ex. B.   The press release claimed that the drug demonstrated a survival benefit for treatment of

10  idiopathic pulmonary fibrosis. Harkonen Decl. Ex. B.  Its headline read: "InterMune Announces Phase

11  III Data Demonstrating Survival Benefit of Actimmune in IPF," and was subtitled: "Reduces Mortality

12  by 70% in Patients with Mild To Moderate Disease." *Id*.  The press release stated that data from the trial

13  demonstrated a "significant survival benefit [for a subgroup of patients] . . . versus control treatment."

14  *Id*.

15       It is undisputed that the survival benefit reported in the press release was based upon a post-hoc

16  analysis, that is, an analysis of data which had not been pre-specified in the clinical trial protocol, in that

17  the written protocol for the clinical trial had not called for an analysis of the subgroup of patients with

18  mild to moderate disease.  Further, the press release was based on an analysis of the clinical trial data

19  through June 26, 2002, and did not include clinical trial data after that date, including two deaths that

20  occurred after June 26, 2002, but before the August 28, 2002 press release.[2]

21       On September 5, 2002, defendant sent InterMune a letter regarding his "serious concerns" about

22  "misrepresentations" in the press release.  Fleming Decl., Ex. E at 1, 4.  The letter stated that at an

23  August 19, 2002, meeting of the DMC during which the DMC reviewed the clinical trial data, the DMC

24

25

---

26       [2]  Plaintiff was criminally prosecuted and convicted for making knowing false and fraudulent
     statements in the press release.   Specifically, a criminal jury found that "the press release's
27  characterization of the [trial's] results were illegitimate and objectively false," leading to plaintiff's
     conviction of one count of wire fraud in violation of Title 18, U.S.C. § 1343. *United States v. Harkonen*,
28  No. C 08-00164 MHP, 2010 WL 2985257, at *20 (N.D. Cal. July 27, 2010).  Plaintiff's appeal of that
     conviction is currently pending in the Ninth Circuit Court of Appeals.

**United States District Court**
For the Northern District of California

1    concluded that Actimmune® did not provide statistically significant evidence of benefit for the primary

2    endpoint (objective) of the clinical trial. *Id.*  The letter also stated,

> The most comprehensive survival data, as presented to the DMC on August
> 19, indicated only a modest suggestion of survival benefit, (18 versus 28 deaths []).
> Given that these survival data were only interim in nature, and that survival was
> only a secondary endpoint, with the protocol specifying that six other secondary
> endpoints were considered to be of greater "clinical relevance to IPF", such
> evidence must be interpreted with much greater caution than as presented in the
> News Release. (Note that the survival data on June 26, 2002, cannot be interpreted
> as the "primary analysis" of the secondary survival endpoint.  Per an agreement
> with FDA and with the DMC at its April 24, 2002 meeting, data on secondary
> endpoints, including survival, would be of an interim nature until completion of
> follow-up at the time of patients' study completion visits.  Once the sponsor knew
> about any survival outcomes that occurred after June 26—specifically that there
> were two additional deaths on Actimmune and none on control—these additional
> outcomes cannot be excluded without bias.)

*Id.* at 3.

        The two other members of the DMC both expressed full agreement with defendant's letter. Riley

Decl. ¶ 8 & Ex. D; Reis Decl. ¶ 11 & Ex. D.  In a letter dated September 27, 2002, InterMune replied

to Dr. Fleming.  InterMune reiterated that the clinical trial's cutoff date was June 26, 2002, and stated

that "[a]lthough we appreciate this point, it is our intention to discourage week-by-week analysis . . .

Our next analysis of survival status will . . . be accomplished by a complete canvas of the vital status

for all patients, including those who have discontinued formal study follow-up."  Fleming Decl., Ex. I

at 4.

        After plaintiff's criminal conviction, defendant wrote an article for the peer-reviewed *Annals of

Internal Medicine*.  Fleming Decl. ¶ 30 & Ex. M.  When writing the article, Dr. Fleming solicited input

from two doctors still employed at InterMune, Bill Bradford and Steven Porter. *Id.* ¶ 35.  Both doctors

provided permission to be acknowledged for their role in reviewing the paper, and neither recommended

any changes to the allegedly defamatory statements in the article. *Id.*  After publication of the article,

plaintiff contacted the editor of the journal requesting certain corrections.  Fleming Decl. ¶ 37 & Ex. O.

Defendant wrote the journal a response to plaintiff's request and asked Dr. Bradford of InterMune to

review a draft of the response before sending it.  Fleming Decl. ¶ 39.[3]  Dr. Bradford reviewed the letter

and  commented that he was "happy to support [Dr. Fleming's] efforts to provide an accurate response

---

[3] Plaintiff objects to this paragraph of Dr. Fleming's declaration as irrelevant.  The Court OVERRULES this objection.

3

**United States District Court**
For the Northern District of California

1  to the [plaintiff's] accusations, and [felt] a moral obligation to do so given the history and clear

2  distortion of fact in [plaintiff's] letter to the Editor at the Annals." Fleming Decl., Ex. Q.[4] The editor

3  of the journal made a correction regarding the cutoff date (changing it from June 15 to June 26, 2002),

4  but the editor made no changes regarding the allegedly defamatory statements. *Id*., Ex. T.[5]

5          Plaintiff alleges that he was defamed by defendant's article in *Annals of Internal Medicine*,

6  public lectures at universities, and defendant's publication of those lectures on the internet, all of which

7  concern the press release.  Plaintiff alleges that in the *Annals* article and the lectures, Fleming made

8  defamatory statements that Harkonen falsified the test data by improperly concealing the deaths of two

9  people. Compl. ¶¶ 16-17.  The complaint provides the following examples of allegedly defamatory

10  statements:

11      •    "The 10 secondary endpoints were all negative. OK survival had a bit of positive trend,

12          P of Point 08, however, survival was an endpoint specifically targeted for follow-up until

13          the clinical closeout visits in November. So the survival data are actually still not final.

14          And in fact between the clinical cut date in October and the date in our [DMC] meeting

15          there were two additional deaths in the acting Actimmune arm so that the updated data

16          were even a little bit less favorable.";

17      •    "Well they went to the 7th secondary endpoint, survival, they went to an interim value,

18          I am going to go back 2 slides, the actual current data were 18 deaths against 28, they

19          ignored those 2 deaths, went back to the 16 against 28 and that still wasn't enough to go

20          to survival and to an interim analysis there was another level of subgrouping, which was

21          the subgroups, they went to those with mild to moderate disease and in mild to moderate

22          disease, there were 6 deaths against 20 in that subgroup.  So they threw away the excess

23          deaths that were in the wrong direction in the other group, in the mild to moderate

24          disease group, there is a 70 percent reduction rate, the P value was 004.";

25      •    "The final analysis of survival data was to include events occurring through the time of

26          the close-out visits because of an anticipated small number of deaths . . . The analysis

27

28

---

[4]  Plaintiff objects to Exhibit Q as irrelevant.  The Court OVERRULES this objection.

[5]  Plaintiff objects to Exhibit T as irrelevant.  The Court OVERRULES this objection.

4

**United States District Court**
For the Northern District of California

1  ignored 2 additional deaths of participants who took Actimmune, which occurred after

2  the 15 June 2002"; "Twelve deaths from the Actimmune subgroup (10 in patients with

3  advanced disease and 2 occurring from 15 June 2002 to 19 August 2002) and 7 deaths

4  from the placebo group (all in patients with advanced disease) were excluded."; "With

5  the inclusion of 2 additional deaths that occurred between the pre-specified cutoff for the

6  primary analysis of the primary end point (15 June 2002) and the release of data to the

7  sponsor (19 August 2002), 18 patients who died had been taking Actimmune and 28 had

8  been taking placebo, with a corresponding nominal 2-sided P value of 0.15."

9  Compl. ¶¶ 16-17. Plaintiff alleges that these "unprivileged oral and written statements about [plaintiff]"

10 have caused "actual injury to [plaintiff's] personal and professional reputation. Specifically, [defendant]

11 has repeatedly accused [plaintiff] of falsifying the GIPF-001 test data by intentionally concealing the

12 deaths of two clinical trial participants." *Id*. ¶ 3. Plaintiff alleges that these "false statements . . . were

13 made of and concerning [plaintiff] and were understood by those who heard them to be [about

14 plaintiff]." *Id*. ¶ 26. Additionally, plaintiff alleges that defendant "knew that these statements were false

15 or acted in reckless disregard to the truth of [the] statements." *Id*. ¶ 27.

16

17                                     **LEGAL STANDARD**

18      The California anti-SLAPP statute permits defendants to bring a "special motion to strike" if a

19 cause of action against them arises "from any act . . . in furtherance of the . . . right of petition or free

20 speech . . . in connection with a public issue," unless "the plaintiff has established that there is a

21 probability that the plaintiff will prevail on the claim." Cal. Code Civ. Proc. § 425.16(b)(1). "In making

22 its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating

23 the facts upon which the liability or defense is based." *Id*. at § 425.16(b)(2). If a defendant prevails on

24 a motion to strike, that defendant "shall be entitled to recover his or her attorney's fees and costs." *Id*.

25 § 425.16(c). Although it is a state statute, California's anti-SLAPP protections apply to state law claims

26 brought in federal court. *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d

27 963, 971-73 (9th Cir. 1999).

28

**United States District Court**
For the Northern District of California

1    In evaluating an anti-SLAPP motion, courts engage in a two-part inquiry. "First, a defendant

2 must make an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the

3 defendant's rights of petition or free speech . . . Second, once the defendant has made a prima facie

4 showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged

5 claims." *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1110 (9th Cir. 2003). The plaintiff's burden is

6 "comparable to that used on a motion for judgment as a matter of law." *Price v. Stossel*, 620 F.3d 992,

7 1000 (9th Cir. 2010). "The plaintiff must demonstrate that the complaint is legally sufficient and

8 supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted

9 by the plaintiff is credited. A defendant's anti-SLAPP motion should be granted when a plaintiff

10 presents an insufficient legal basis for the claims or when no evidence of sufficient substantiality exists

11 to support a judgment for the plaintiff." *Id.* at 1000 (citations and internal quotation marks omitted).

12 Evidence must be admissible and is not weighed by the Court, but presumed true if in favor of the

13 plaintiff. *See, e.g.*, *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001); *Tichinin v. City*

14 *of Morgan Hill*, 177 Cal. App. 4th 1049, 1062 (2009).

15

16                                           **DISCUSSION**

17  **I.      Act in furtherance of the defendant's rights of free speech**

18    The first step in analyzing an anti-SLAPP suit is determining whether the defendant successfully

19 made "an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the

20 defendant's rights of petition or free speech." *Vess*, 317 F.3d at 1110. Defendant argues that

21 "[p]laintiff's [c]omplaint indisputably arises from statements in a respected scientific journal and

22 lectures over a matter that [p]laintiff acknowledges is in the public's interest." Mot. to Strike Compl.

23 at 1. Plaintiff concedes for the purposes of this motion that "this threshold requirement is met," and that

24 the burden shifts to the plaintiff to demonstrate a probability of success on the claim. Pl.'s Opp'n at 5.

25

26  **II.     Defamation**

27    For plaintiff's defamation claim to survive dismissal at this stage, plaintiff must demonstrate a

28 probability that he will prevail on each element. Under California law, to state a *prima facie* case of

**United States District Court**
For the Northern District of California

1    defamation, a plaintiff must show (1) "the intentional publication" of (2) "a statement of fact" that (3)

2    is "false" (4) "unprivileged," and (5) "has a natural tendency to injure or which causes special damage."

3    *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999).  Additionally, if plaintiff is found to be a limited

4    purpose public figure, plaintiff "must establish a probability that he or she can produce clear and

5    convincing evidence that allegedly defamatory statements were made with knowledge of their falsity

6    or with reckless disregard of their truth or falsity."  *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151

7    Cal. App. 4th 688, 700 (2007) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)).

8    Further, the First Amendment requires that a defamation claim be based on a statement "of and

9    concerning" the plaintiff.  *Blatty v. New York Times,* 42 Cal. 3d 1033, 1042 (1986).

10

11           **A.      Common interest privilege**

12           Defamation requires that the allegedly false statement be unprivileged.  The parties dispute

13    whether defendant's statements fall under the common interest privilege defined by Cal. Civ. Code

14    § 47(c)(1) ("A privileged publication or broadcast is one made in a communication, without malice, to

15    a person interested therein . . . by one who is also interested.").

16           Here, defendant is a professor whose allegedly defamatory statements appeared in *Annals of*

17    *Internal Medicine*, an academic medical journal published by the American College of Physicians

18    (ACP).  The statements were allegedly also made during speeches at universities such as the University

19    of Washington, School of Public Health.  Fleming Decl. ¶ 41.[6]  Such scholarly activity is generally

20    considered to fit within the common interest privilege.  *See Taus v. Loftus*, 40 Cal. 4th 683, 721 (2007)

21    ("[I]t is clear that the alleged defamatory statement here in question—a statement made by [defendant],

22    a psychology professor and author, at a professional conference attended by other mental health

23    professionals and that was related to the subject of the conference—falls within the reach of this

24    statutory common-interest privilege."); *Lundquist v. Reusser*, 7 Cal. 4th 1193, 1204 (1994) (statements

25    made at "a seminar to persons sharing a common interest in horse breeding, were made upon a

26    'privileged occasion' for purposes of the common-interest privilege"); *Institute of Athletic Motivation*

27

28           [6]  Plaintiff objects to this paragraph of Dr. Fleming's declaration as irrelevant.  The Court
OVERRULES this objection.

**United States District Court**
For the Northern District of California

1   *v. University of Illinois*, 114 Cal. App. 3d 1, 7-14 (1980) (common-interest privilege applied to letter,

2   criticizing plaintiff's "sports-specific" psychological testing, that was sent by university physical

3   education professor to athletic organizations and sports magazines); *Katz v. Rosen*, 48 Cal. App. 3d 1032

4   (1975) (common-interest privilege applied to letter sent by defendant to local bar association

5   complaining of plaintiff attorney's conduct).   Under this authority, the Court finds that defendant's

6   lectures and journal article are privileged under Cal. Civ. Code § 47(c)(1).

7          "Under Civil Code section 47, subdivision (c), defendant generally bears the initial burden of

8   establishing that the statement in question was made on a privileged occasion, and thereafter the burden

9   shifts to plaintiff to establish that the statement was made with malice." *Taus*, 40 Cal. 4th at 721.  "The

10  malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that

11  the publication was motivated by hatred or ill will towards the plaintiff or by a showing that the

12  defendant lacked reasonable ground for belief in the truth of the publication and thereafter acted in

13  reckless disregard of the plaintiff's rights." *Sanborn v. Chronicle Pub. Co.*, 18 Cal. 3d 406, 413 (1976);

14  *see also* Cal. Civ. Code § 48a(4)(d) ("'Actual malice' is that state of mind arising from hatred or ill will

15  toward the plaintiff; provided, however, that such a state of mind occasioned by a good faith belief on

16  the part of the defendant in the truth of the libelous publication or broadcast at the time it is published

17  or broadcast shall not constitute actual malice.").  When considering privileged speech, the plaintiff must

18  establish a probability that he can show the defendant acted with malice by a preponderance of the

19  evidence.  *Manguso v. Oceanside Unified Sch. Dist.*, 153 Cal. App. 3d 574, 580-81 (1984).   The

20  presence *vel non* of actual malice in this case is discussed later in this order.

21

22          **B.      Limited purpose public figure**

23          The parties dispute whether plaintiff qualifies as a limited purpose public figure under First

24  Amendment jurisprudence. "[W]hether a plaintiff in a defamation action is a public figure is a question

25  of law for the trial court." *Khawar v. Globe Int'l, Inc.*, 19 Cal. 4th 254, 264 (1998).  "The limited

26  purpose public figure is an individual who voluntarily injects him or herself or is drawn into a specific

27  public controversy, thereby becoming a public figure on a limited range of issues." *Ampex Corp. v.*

28  *Cargle*, 128 Cal. App. 4th 1569, 1577 (2005).  *Ampex* sets forth the three part test for determining

1  whether an individual is a limited purpose public figure: "First, there must be a public controversy,

2  which means the issue was debated publicly and had foreseeable and substantial ramifications for

3  nonparticipants.  Second, the plaintiff must have undertaken some voluntary act through which he or

4  she sought to influence resolution of the public issue.  In this regard it is sufficient that the plaintiff

5  attempts to thrust him or herself into the public eye.  And finally, the alleged defamation must be

6  germane to the plaintiff's participation in the controversy." *Id.*

7         The Court finds that the first step of the *Ampex* test – public controversy – is met. "In general,

8  [a] public issue is implicated if the subject of the statement or activity underlying the claim (1) was a

9  person or entity in the public eye; (2) could affect large numbers of people beyond the direct

10  participants; or (3) involved a topic of widespread, public interest." *D.C. v. R.R.*, 182 Cal. App. 4th

11  1190, 1226 (2010) (internal citations omitted).  Defendant's speech addressed the interpretation of

12  clinical trial results and the dangers of post-hoc analyses.  The issue was debated publicly in academic

13  circles, and involved a topic of widespread interest.  Plaintiff does not seriously dispute that the alleged

14  defamation involved a matter of public interest, and indeed the declarations from scientists and

15  academics and news articles submitted by plaintiff demonstrate that the issue of appropriate

16  interpretation of clinical trial data was, and remains, hotly debated.  *See Taus*, 40 Cal. 4th at 712-13

17  (articles in scientific journal regarding suppressed memories of childhood abuse constituted speech in

18  connection with a public issue given "substantial controversy in the mental health field regarding

19  whether, and under what circumstances, a victim of child abuse might forget or suppress the memory

20  of the abuse over a long period of time and later recover that memory in response to questioning or other

21  actions by a therapist"); *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 25 (2007) (holding that "the relative

22  merits of plastic surgery" qualifies as a public controversy).

23         Second, plaintiff willingly inserted himself into the public's eye on this issue by issuing a press

24  release regarding the clinical trial data.  *See Ampex*, 128 Cal. App. 4th at 1578 (corporation and its

25  chairman were limited purpose public figures based on issuance of press release and posting of letters

26  on company web site).  Plaintiff cites inapposite authority stating that one's response to defamatory

27  speech cannot support finding voluntary participation in a public controversy.  *See Hutchinson v.*

28  *Proxmire*, 443 U.S. 111 (1979); *see also Hailstone v. Martinez*, 169 Cal. App. 4th 728, 735 (2008) ("a

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    defendant charged with defamation cannot, through his or her own conduct, create a defense by making

2    the claimant a public figure."). Here, plaintiff's press release concerning the health effects of a drug

3    manufactured by a public company created an issue of public controversy before defendant's allegedly

4    defamatory statements, and the press release was an intentional act seeking public attention.

5          Third, the alleged defamation must be germane to the plaintiff's participation in the controversy.

6    This element of the test is met and not contested. The alleged defamation concerns the statements made

7    in the press release.

8

9          **C.    Actual malice**

10         Plaintiff bears the burden of demonstrating that defendant acted with actual malice, both because

11   the accused statements fall within the common interest privilege, Civil Code § 47(c), and because

12   plaintiff was a limited purpose public figure. Plaintiff's burden of proof on actual malice is by a

13   preponderance of the evidence, as to the common interest privilege. It is somewhat higher as to the

14   limited public figure claim: "[L]imited purpose public figures such as [plaintiff] who sue for defamation

15   must establish a probability that they can produce clear and convincing evidence that the allegedly

16   defamatory statements were made with knowledge of their falsity or with reckless disregard of their

17   truth or falsity." *Ampex*, 128 Cal. App. 4th at 1578. Malice "will not [be] infer[red] . . . solely from

18   evidence of ill will, personal spite or bad motive." *Id.* at 1579. Instead, "[a] court may consider a

19   defendant's anger or hostility toward a plaintiff in determining the presence of malice only to the extent

20   it impacts the defendant's *actual belief* concerning the truthfulness of the publication. The focus is thus

21   on the defendant's attitude toward the truth or falsity of the material published . . . [not] the defendant's

22   attitude toward the plaintiff." *Christian Research Inst. v. Alnor*, 148 Cal. App. 4th 71, 92 (2007)

23   (internal quotation marks omitted) (emphasis in original) (citing *Reader's Digest Assn. v. Superior*

24   *Court*, 37 Cal.3d 244, 258 (1984)).

25         Plaintiff asserts that defendant acted with actual malice because he knew that his statements were

26   false. Plaintiff argues that if "[e]ven a casual reader" can understand that the cutoff date was fixed, then

27   the Court should infer that defendant knew that his statements about ignoring "two additional deaths"

28   were factually inaccurate. Pl.'s Opp'n at 12. Plaintiff also asserts that the statements were motivated

10

United States District Court
For the Northern District of California

1    by hatred or ill will toward the plaintiff.  Harkonen Decl. ¶¶ 16-17 ("Dr. Fleming became very angry

2    at InterMune, and, specifically at me."; "Dr. Fleming would never speak to me again after this insult [of

3    excluding Dr. Fleming from a meeting]."; "he [Dr. Fleming] told me that he had nothing to say to me.";

4    "He [Dr. Fleming] would not acknowledge my presence or make eye contact with me.").

5          The evidence before the Court demonstrates that plaintiff cannot prove, under either standard,

6    that defendant acted with actual malice – that is, with knowledge of the statements' falsity or with

7    reckless disregard of their truth or falsity.  Before publishing his article in the *Annals of Internal*

8    *Medicine*, defendant solicited the comment and input of employees at InterMune who had been involved

9    in the Actimmune® study.  Those scientists reviewed the article, affirmed its accuracy, and one

10   specifically affirmed the statement: "the final analysis of survival data was to include events occurring

11   through the time of the close-out visits because of an anticipated small number of deaths."  Fleming

12   Decl. ¶ 39 & Ex. Q.  Additionally, the journal's editor received notice of plaintiff's concerns and elected

13   to publish the article notwithstanding the complaint.  The medical journal's support of the article is

14   compelling evidence that defendant did not act in reckless disregard of the facts.  This evidence, even

15   when viewed in a light most favorable to plaintiff, defeats the malice requirement of knowingly

16   publishing false information or publishing in reckless disregard for the truth.  *See New York Times Co.*

17   *v. Sullivan*, 376 U.S. at 287 (under the facts of the case, failure to thoroughly investigate when relying

18   on the statements of those with good reputations "supports at most a finding of negligence in failing to

19   discover the misstatements, and is constitutionally insufficient to show the recklessness that is required

20   for a finding of actual malice"); *see also Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 84 (1967)

21   (a *lack* of investigation may, but does not necessarily, imply reckless disregard).

22

23   **III.    Intentional infliction of emotional distress**

24         Under California law, the elements of a *prima facie* case of intentional infliction of emotional

25   distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or

26   reckless disregard of the probability of causing, emotional distress; (2) plaintiff's suffering severe or

27   extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the

28   defendant's outrageous conduct.  *Hughes v. Pair*, 46 Cal.4th 1035, 1050 (2009).  Additionally, "[t]o

11

**United States District Court**
For the Northern District of California

1   impose liability on that theory [of intentional infliction of emotional distress] it must appear that the

2   defendant's conduct was unprivileged." *Kachig v. Boothe*, 22 Cal. App. 3d 626, 641 (1971).

3          Given the academic nature of defendant's speeches and journal publication, the supporting

4   testimony of InterMune employees, and the privileged nature of defendant's speech, plaintiff fails to

5   demonstrate a probability of succeeding on this claim.

6

7   **IV.     False light invasion of privacy**

8          In California, "a 'false light' cause of action is in substance equivalent to a libel claim, and

9   should meet the same requirements of the libel claim, including proof of malice." *Aisenson v. Am.*

10  *Broad. Co.*, 220 Cal. App. 3d 146, 161 (1990).  Further, "[w]hen a false light claim is coupled with a

11  defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets

12  the same requirements as the defamation cause of action." *Eisenberg v. Alameda Newspapers, Inc.*, 74

13  Cal. App. 4th 1359, 1385 n.13 (1999).  Accordingly, plaintiff's false light invasion of privacy claim fails

14  for the same reasons stated above.

15

16                              **CONCLUSION**

17          For the reasons set forth above, the Court GRANTS defendant's motion to strike the complaint.

18  Docket No. 10.

19

20          **IT IS SO ORDERED.**

21

22  Dated: July 24, 2012                              _____

                                                      SUSAN ILLSTON
                                                      United States District Judge

23

24

25

26

27

28